UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

DR. ROBERT C. VICK,                    )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        No.:  3:13-CV-730-TAV-CCS
                                       )
JEFFERSON COUNTY BOARD OF              )
EDUCATION a/k/a JEFFERSON             )
COUNTY SCHOOLS,                        )
                                       )
            Defendant.                 )

## MEMORANDUM OPINION

This matter is before the Court following a two-day bench trial occurring on October 5–6, 2015 [Docs. 34–40]. Following the trial, the parties filed proposed findings of fact and conclusions of law [Docs. 43, 44].

Plaintiff, Dr. Robert Vick, seeks relief against defendant, Jefferson County Board of Education, alleging the following causes of action: (1) breach of contract; (2) violation of procedural due process; and (3) violation of substantive due process [Doc. 25 p. 1].

After giving careful consideration to the testimony of the witnesses [Doc. 36], the exhibits introduced at trial [Doc. 37], the transcripts of the proceedings [Docs. 39, 40], the proposed findings of fact and conclusions of law [Docs. 43, 44], and the applicable law, the Court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a) ("In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately.").

## I.    Findings of Fact[1]

1.     Plaintiff, Dr. Robert Vick, was employed by defendant, Jefferson County Board of Education, from 1996 until 2011 [Doc. 40 pp. 5–6].

2.     He served as principal of Jefferson Elementary School ("JES") from 2002 until 2009 [*Id.* at 6].

3.     On September 3, 2008, plaintiff and Dr. Archie Bone, Director of Schools for defendant at the time, executed a Principals' Performance Contract (the "Contract") [Joint Trial Ex. 1].

4.     Dr. Bone drafted the Contract [Joint Trial Ex. 42 p. 35].

5.     The heading of the Contract contains the words "**JULY 2008 – JUNE 2009**" in bold and all caps [*Id.*].

6.     Under the subheading "Term," the Contract states that "[t]he term of this contract shall be as follows, beginning July 1, 2008 and concluding June 30, 2009" [*Id.*]. The specified dates are handwritten in blanks on the Contract [*Id.*].

7.     The Contract provides that "the State of Tennessee requires the Director of Schools to employ principals with written contracts that include performance standards (TCA 49-2-301 and TCA 49-2-303)" [*Id.*].

8.     The Contract also includes the following provisions:

Failure to adequately perform on principal's operational objectives and/or achieve school instructional goals will be addressed as follows:
- Goals that are deemed not acceptable for the first year shall require the principal to submit a plan to achieve the goals.

---

[1] The Court only makes the findings of fact necessary to reach its conclusions of law.

2

- Goals that are deemed not acceptable for two consecutive years shall result in a different placement and/or removal of the principal from administrative duties.

[*Id.*].

9.     Plaintiff and Dr. Bone did not discuss the terms of the Contract on September 3, 2008 [Doc. 40 p. 12].

10.     On that day they did discuss some general goals they would attempt to accomplish in the coming year [Doc. 40 pp. 10, 14, 50].

11.     At some point subsequent to September 3, 2008, the goals they discussed were formalized into a ten-page document entitled "Principal Performance Contract Instructional Objectives" with the dates "2008–2009" in the left corner on each page [Doc. 40 p. 50; Joint Trial Ex. 2].

12.     When plaintiff executed the Contract on September 3, 2008, it was only a one-page document and the goals sheet was not attached [Doc. 40 p. 50; *see also* Joint Trial Ex. 2].

13.     Both plaintiff and Dr. Bone believed the "Principal Performance Contract Instructional Objectives" was part of the Contract [Doc. 40 p. 13; Joint Trial Ex. 42 pp. 37, 64].

14.     According to Dr. Bone, some of the goals included in the Contract were "long-range goals" [Joint Trial Ex. 42 p. 45].

15.     On April 9, 2009, the Jefferson County Board of School Commissioners (the "Board") held a meeting [Joint Trial Ex. 10].

3

16. During this meeting, the Board "approved the list of tenure teachers for the 2009–10 school year" [*Id.* at 5].

17. Plaintiff was listed among the teachers approved for the school year and JES was listed next to his name [Joint Trial Ex. 25 p. 2].

18. The approved list also stated that "[n]on-instructional assignments will be made at a later Board meeting" [*Id.* at 1].

19. Throughout his time serving as principal at JES, plaintiff found out his assignments for the coming year once the Board published a list of assignments to a local paper [Doc. 40 p. 6].

20. Typically, plaintiff would know in April or May what his assignment was for the next school year [*Id.*].

21. In April 2009, plaintiff received notice that he was being assigned to JES for the following school year [*Id.* at 23].

22. On June 18, 2009, Dr. Bone notified plaintiff by letter that his Contract as principal of JES would not be renewed for the 2009–2010 school year [Joint Trial Ex. 21].

23. Dr. Bone further informed plaintiff in the letter that, as a tenured teacher in the Jefferson County School System, plaintiff was "being placed in a position of system wide math teacher" and that the "assignment [was] being made in the interests of the efficient operation of the school system" [*Id.*].

4

24.     On June 30, 2009, Dr. Bone notified plaintiff that his "specific assignment will be a math teacher at Maury Middle School" [Joint Trial Ex. 22].

25.     Plaintiff is a tenured teacher with a teaching certificate in math [Doc. 40 p. 101].

26.     Plaintiff wrote a letter to Anne Marie Potts, chairman of the Board during this time, dated July 2, 2009, in which he referred to his change in position as a "transfer" [Joint Trial Ex. 24].

27.     On July 16, 2009, the Board conducted a meeting and discussed the "transfer" of plaintiff [Joint Trial Ex. 26 pp. 2, 4; Joint Trial Ex. 27 pp. 3–4].

28.     During that meeting, the Board discussed Board Policy 5.115 and whether plaintiff's transfer was in violation of that policy [Joint Trial Ex. 27 pp. 3–4].

29.     Board Policy 5.115 governs assignments and transfers of defendant's employees [Joint Trial Ex. 19].

30.     With regard to assignments, Board Policy 5.115 states "[t]he director of schools shall assign personnel to the various schools or departments by May 15" and that "assignment will be determined by the applicant's training, experience and ability to perform the duties of the position and in the best interest of the schools" [*Id.*].

31.     According to Connie Campbell, who acted as defendant's Director of Assessment and Curriculum from 2008–2009 and as Director of Schools from 2009–2010, the May 15th deadline for assignments only applied to classroom teachers and a deadline of June 30th applied to principals [Doc. 39 pp. 136–37].

32. Board Policy 5.115 defines transfer as "to move from one school or administrative unit to another" [Joint Trial Ex. 19].

33. According to Board Policy 5.115, "[t]he director of schools shall transfer employees as necessary for efficient operation of the schools. Transfers shall be non-discriminatory and shall not be arbitrary or capricious" [*Id.*].

34. Board Policy 5.115 further provides that "[a]ll employees transferred shall receive written notification of the transfer with reason(s) prior to the transfer. If a transfer is performance-based, the transfer shall be preceded by a written statement of deficiencies and when feasible, a reasonable opportunity to improve" [*Id.*].

35. Under Board Policy 5.115, "[t]ransfers made in accordance with board policy, state law and any negotiated contract are final" [*Id.*].

36. Board Policy 5.115 does not contain a deadline limiting the date upon which an employee may be transferred [*Id.*].

37. In each year that plaintiff served as principal of JES, from 2002 until 2009, he signed and executed a new contract [Doc. 40 pp. 6, 49, 98].

38. Plaintiff acknowledges that he expected to have to sign something when returning to JES as principal for the 2009–2010 school year [*Id.* at 98].

39. A director of schools may enter into multi-year contracts with principals [Doc. 39 p. 150].

40. Plaintiff never received an evaluation from Dr. Bone during the 2008–2009 school year [Doc. 40 p. 15].

41.     Plaintiff received all of his pay and benefits he was entitled to during the 2008–2009 school year [*Id.* at 52].

## II.     Conclusions of Law

42.     Plaintiff alleges the following three causes of action: (1) breach of contract; violation of procedural due process; and (3) violation of substantive due process [Doc. 25 p. 1].  The Court will address each of these claims in turn.

### A.     Breach of Contract

43.     To establish a breach of contract under Tennessee law, a plaintiff must show the existence of an enforceable contract, a breach of that contract, and damages as a result of that breach.  *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006).

44.     "The interpretation of a written contract is a question of law."  *BSG, LLC v. Check Velocity, Inc.*, 395 S.W.3d 90, 92 (Tenn. 2012).

45.     A cardinal rule of contract interpretation is to ascertain and give effect to the parties' intent.  *Dick Broad. Co., of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013).  In determining the parties' intent, courts should focus on "the four corners of the entire contract, the circumstances in which the contract was made, and the parties' actions in fulfilling their contractual obligations."  *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 42 (Tenn. 2014).

46.     "If the contract language is found to be clear and unambiguous, the contract language is interpreted according to its plain terms and ordinary meaning." *BSG*, 395 S.W.3d at 93.

47.     Courts should interpret contracts in a way that gives "reasonable meaning to all of the provisions in the agreement, without rendering portions of it neutralized or without effect." *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). Furthermore, "[a]ll provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999).

48.     It is also a "well settled rule of contract interpretation that particular and specific provisions of a contract prevail over general provisions." *Precision Mech. Contractors v. Metro. Dev. & Hous. Agency*, No. M2000-02117-COA-R3-CV, 2001 WL 1285900, at *5 (Tenn. Ct. App. Oct. 25, 2001) (citing *S. Sur. Co. v. Town of Greenville*, 261 F.929 (6th Cir. 1920)).

49.     If the terms of a contract are ambiguous, courts employ other rules of contract construction to determine the parties' intent. *Dick Broad.*, 395 S.W.3d at 659. Contract language will not be considered ambiguous merely because the parties differ as to their interpretation of the language. *BSG*, 395 S.W.3d at 93. A contract is ambiguous only when it is of "uncertain meaning" and may fairly be understood multiple ways. *Maggart*, 259 S.W.3d at 704. "The Court will not use a strained construction of the language to find an ambiguity where none exists." *Id.*

50.     One of the principles courts rely on when analyzing ambiguous contracts is that ambiguous provisions will be construed against the drafter of the contract. *Kiser v. Wolfe*, 353 S.W.3d 741, 748 (Tenn. 2011).

51.     With these principles in mind, the Court turns to the Contract at issue. As an initial matter, the Court finds, and defendant does not appear to dispute, that the Contract was valid and enforceable. The determination of whether defendant breached the Contract requires the Court to engage in contract interpretation.

52.     Defendant argues that the Contract, by its express and unambiguous terms, governed a one-year period beginning July 1, 2018, and concluding June 30, 2009 [Doc. 43 p. 27]. In support, defendant points to the heading of the Contract containing the words "**JULY 2008 – JUNE 2009**" in bold and all caps [Joint Trial Ex. 1]. Defendant also argues that the "Term" section of the Contract clearly and unambiguously states that "[t]he term of this contract shall be as follows, beginning July 1, 2008 and concluding June 30, 2009" [*Id.*].

53.     Plaintiff, however, argues that the Contract, by its express terms, was a multi-year performance contract, and that concluding otherwise would render the multi-year language superfluous [Doc. 44 pp. 8–9]. In particular, plaintiff points to provisions in the Contract stating that a failure to perform goals for the first year "shall require the principal to submit a plan to achieve the goals," and failure to meet goals for two consecutive years "shall result in a different placement and/or removal of the principal

from administrative duties" [Joint Trial Ex. 1]. Furthermore, plaintiff notes that the Contract references Tenn. Code Ann. § 49-2-303, which provides, in pertinent part:

> The employment contract with each principal shall be in writing, shall not exceed the contract term of the current director of schools, and may be renewed. The contract shall specify duties other than those prescribed by statute and shall contain performance standards including the requirement that the principal's annual evaluation be based on student achievement data, with a significant portion, as defined by the guidelines and criteria adopted by the board.

*Id.* § 49-2-303(a)(1).

54.     In light of the relevant legal principles of contract interpretation, the Court finds that the plain and ordinary terms of the Contract clearly and unambiguously provide for a one-year term beginning July 1, 2008, and concluding June 30, 2008. *See BSG*, 395 S.W.3d at 93.

55.     The Court finds that the alleged "multi-year" language can be reconciled with the one-year term of the Contract without rendering any language superfluous. The Contract includes a reference to Tenn. Code Ann. § 49-2-303, which provides that a director of schools may renew employment contracts with principals. *Id.* § 49-2-303(a)(1). The multi-year language contained in the Contract providing consequences for principals when "goals [] are deemed not acceptable" after the first year and also after two consecutive years are relevant provisions should the director of schools renew the Contract [Joint Trial Ex. 1]. The provisions are also informational to the signing principal, and as Dr. Bone suggests, some of the goals included in the Contract were "long-range goals" [Joint Trial Ex. 42 p. 45].

10

56.     Interpreting the Contract as having a one-year term is also consistent with plaintiff's contention that he expected to have to sign "something" when returning to JES as principal for the 2009–2010 school year [Doc. 40 p. 98].  Because the 2008–2009 Contract includes language relevant to subsequent years, a renewal of that Contract for the following year would not need to be extensive.

57.     The Court further notes that the multi-year language does not preclude a new placement or removal of the principal in less than two years [*See* Joint Trial Ex. 1]. Rather, the Contract states that "[g]oals that are deemed not acceptable two consecutive years *shall* result in a different placement and/or removal" [*Id.* (emphasis added)].  While the Contract mandates different placement and/or removal if goals are not acceptable for two consecutive years, there is no guarantee in the Contract that a principal will be permitted to stay for that duration [*Id.*].

58.     Furthermore, interpreting the Contract in the matter plaintiff advocates would render the "**JULY 2008 – JUNE 2009**" notation, the "<u>Term</u>" section, and the indication of "2008–2009" on each page of the goals sheets superfluous [Joint Trial Ex. 1, 2].  Plaintiff appears to argue that the Contract provides for an initial term of July 1, 2008, through June 30, 2008, with ongoing renewal subject to Tenn. Code Ann. §§ 49-2-301 and 49-2-303.  The Court, however, does not find that plaintiff's interpretation is a natural reading of the Contract.  The specified school year of 2008–2009 appears on the Contract many times, and it is never qualified with the term "initial" or any other word

that would have a similar affect. Also absent from the Contract is any clear intent to provide ongoing renewal.

59.     The Court finds that interpreting the Contract as governing the one-year period of July 1, 2008, through June 30, 2008, and providing that the multi-year language is relevant to potential renewal and long-term goals, is the only way to construe the provisions "in harmony with each other" and "to promote consistency" within the terms of the Contract. *Guiliano*, 995 S.W.2d at 95.

60.     In addition, the Court is cognizant of the principle of contract interpretation requiring that "specific provisions of a contract prevail over general provisions." *Precision Mech. Contractors*, 2001 WL 1285900, at *5. The Contract includes the specific and express provision under the heading "Term" stating that the term of the Contract shall begin July 1, 2008, and end June 30, 2009 [Joint Trial Ex. 1]. The Contract does not include any multi-year language within the "Term" provision and does not include language regarding ongoing renewal. The provision simply dictates the year-long term.

61.     In contrast, the provisions plaintiff relies on to support his position are more general. These provisions refer broadly to the inclusion of performance standards and a "[f]ailure to adequately perform on principal's operational objectives and/or achieve school instructional goals" [*Id.*]. Also, while the language contemplates that the signing principal may stay more than one year the text does not require it [*See id.*]. Because the "Term" of the Contract is highly specific, and the provisions regarding

12

potential repercussions for the failure to achieve goals are fairly general, the Court finds that the "Term" provision should prevail over the multi-year language. *See Precision Mech. Contractors,* 2001 WL 1285900, at *5.

62.     Plaintiff points out that Tenn. Code Ann. § 49-2-303, which is referenced in the Contract, provides for annual evaluations of principals.  It does not appear from the record that plaintiff ever received a formal evaluation from Dr. Bone, or anyone else during the 2008–2009 school year [*See* Doc. 40 p. 15].  The Court notes, however, that the Code also states that "[r]easons for the nonrenewal of a contract may include, but are not limited to, inadequate performance as determined by the evaluations."  Tenn. Code Ann. § 49-2-303(a)(1).  A formal evaluation, therefore, was not necessary for a valid nonrenewal under Tennessee law.  The Code expressly states that nonrenewal is not limited to poor performance evidenced by an evaluation.

63.     The Court notes that there was a significant amount of trial testimony regarding whether plaintiff was assigned to JES in April 2009, and whether his change in position to a math teacher constituted a transfer or an assignment.  The Court does not find that these considerations are relevant in determining whether defendant breached the Contract.  Plaintiff does not appear to be alleging that an assignment in April 2009 would constitute a contract renewal.  Plaintiff provides no argument to that effect in his post-trial filing, and the Court finds no language in the Contract or in supporting documentation indicating that an assignment in April 2009 would constitute a renewal of

the Contract. Plaintiff himself acknowledges that he expected to have to sign something when returning to JES as principal for the 2009–2010 school year [Doc. 40 p. 98].

64.     Furthermore, Board Policy 5.115 provides that the decision to assign or transfer personnel is a decision for the director of schools [Joint Trial Ex. 19]. There is no provision in Board Policy 5.115 indicating that the director of schools cannot transfer an employee after assigning him [*Id.*]. In fact, the policy states that "[t]he director of schools is responsible for developing and disseminating procedures for transfer" [*Id.*].

65.     To the extent defendant violated board policy, or Tennessee law, in its actions—a finding the Court does not make—plaintiff has not presented any argument that such a violation constitutes a breach of the one-year Contract.

66.     Plaintiff admits that he received all of his pay and benefits that he was entitled to during the 2008–2009 school year [Doc. 40 p. 52]. As such, because the Court determines that the Contract term ended June 30, 2009, the Court finds that defendant did not breach its obligations under the Contract.

67.     In sum, the Court finds that defendant is not liable for breach of contract.

**Procedural Due Process**

68.     To establish a procedural due process claim, a plaintiff must show the following: 1) that he had a life, liberty, or property interest protected by the Due Process Clause; 2) that he was deprived of this protected interest; and 3) he was not afforded adequate procedural rights prior to the deprivation. *Albrecht v. Treon*, 617 F.3d 890, 894 (6th Cir. 2010).

14

69.     "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972).

70.     "Whether a property interest exists is not determined by reference to the Constitution; rather, property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Brown v. City of Niota*, 214 F.3d 718, 721 (6th Cir. 2000).

71.     Such independent sources can include state statutes, contractual guarantees, or even agreements "implied from [a] defendant['s] words and conduct in light of the surrounding circumstances." *Woolsey v. Hunt*, 932 F.2d 555, 564 (6th Cir. 1991).

72.     "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it." *Bd. of Regents*, 408 U.S. at 577.  A plaintiff "must have more than a unilateral expectation of" the claimed benefit—he must "have a legitimate claim of entitlement to it." *Id.*

73.     As a general matter, "[t]he Tennessee legislature did not intend that a principal should have a statutory entitlement to his principalship." *Sharp v. Lindsey*, 285 F.3d 479, 487 (6th Cir. 2002).  Accordingly, for plaintiff to establish a protected property interest in his employment as principle at JES, he must point to some other source.

74.     Plaintiff points to *Sharp v. Lindsey*, 285 F.3d 479 (6th Cir. 2002), to support his contention that he had a protected property interest pursuant to the terms of his principal contract.  The Court notes, however, that in *Sharp*, the Sixth Circuit

15

determined that the plaintiff had a protected property interest through his contract because he was transferred to a math tutor position during the term of his principal contract. *Id.* at 484, 488. In contrast, here, the Court has already determined that the Contract expired on June 30, 2009. As such, the Contract did not provide plaintiff with a legitimate expectation of continued employment as a principal after June 30, 2009.

75. In the alternative, plaintiff argues that even if plaintiff's move from principal to math teacher constituted a transfer under Board Policy 5.115, the transfer was done in an arbitrary or capricious manner and was, therefore, invalid.

76. Tennessee law provides that "[a] principal who has tenure as a teacher shall retain all rights to such status, expressly including those specified in § 49-5-510." Tenn. Code Ann. § 49-2-303(a)(1). As such, plaintiff, as a tenured teacher, retained all rights of his status as a tenured teacher. Section 49-5-510 provides that "[t]he director of the schools, when necessary to the efficient operation of the school system, may transfer a teacher . . . provided that transfers shall be acted upon in accordance with board policy." *Id.* § 49-5-510. Board Policy 5.115 prohibits transfers that are "arbitrary or capricious" [Joint Tr. Ex. 19].

77. The Court notes, however, that "the absence of any claim by the plaintiff that an interest in liberty or property has been impaired is a fatal defect" to a due process claim. *Sullivan v. Brown*, 544 F.2d 279, 282 (6th Cir. 1976). The Sixth Circuit has stated that "[t]here can be no doubt under Tennessee law that the transfer of a tenured teacher . . . . does not amount to a deprivation of 'property.'" *Id.* Consequently, because plaintiff

16

has not established that he had any "federally protected right" to his position as a principal, even if the Court presumes defendant violated Board Policy 5.115 because the transfer was arbitrary or capricious, that violation would not amount to a deprivation of property protected by the Fourteenth Amendment. *Id.*

78.     Once plaintiff's Contract expired, he only retained the right to a position as a teacher.  Even if defendant violated Board Policy 5.115 in transferring plaintiff—a finding the Court does not make—that violation is not sufficient to show a violation of plaintiff's procedural due process rights because plaintiff was not deprived of employment as a teacher.

79.     In sum, the Court finds that defendant is not liable for violations of procedural due process.

**<u>Substantive Due Process</u>**

80.     Lastly, plaintiff argues that he was deprived of his substantive due process right within the meaning of the "impairment of contracts" provision of federal and state constitutions and his right to be free from arbitrary and capricious state action related to his employment.

81.     As the Court has already found that defendant did not breach the Contract, plaintiff's first argument as to substantive due process fails for the reasons previously discussed.

82.     As to plaintiff's second argument, the Sixth Circuit has recognized that "the Fourteenth Amendment has a substantive due process component that protects specific

fundamental rights of individual freedom and liberty from the deprivation at the hands of arbitrary and capricious government action." *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1350 (6th Cir. 1992). The Sixth Circuit, however, has declined to conclude that a plaintiff's statutory right to be discharged only for cause is a fundamental interest protected by substantive due process. *Id.* at 1351.

83. As the Court has already found that plaintiff had no property interest in a principal position, the only remaining inquiry is whether plaintiff's right not to be transferred in an arbitrary or capricious manner constitutes a fundamental right. In light of the Sixth Circuit precedent declining to find that employees have a fundamental interest in their statutory right not to be discharged without cause, the Court finds that plaintiff does not have a fundamental right protected by substantive due process not to be transferred in an arbitrary or capricious manner. *See id.*

84. Consequently, even if defendant's actions violated Board Policy 5.115, absent the infringement of some fundamental right, plaintiff's transfer in "public employment does not constitute a denial of substantive due process." *Id.*

85. In sum, the Court finds that defendant is not liable for violating plaintiff's substantive due process rights.

III. **Conclusion**

Based on the Court's findings of fact and conclusions of law as stated above, the Court **FINDS** in favor of defendant on all claims. Defendant will, therefore, **NOT BE**

18

**LIABLE** for damages to plaintiff. Accordingly, the Court will **DISMISS** plaintiff's claims and will **DIRECT** the Clerk of Court to **CLOSE** this case.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE